IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 27, 2021

**STEVIE MICHAEL IRWIN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County
No. 110529   G. Scott Green, Judge**

_____

**No. E2020-01598-CCA-R3-PC**
_____

The petitioner, Stevie Michael Irwin, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial and on appeal. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Stevie Michael Irwin.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Charme Allen, District Attorney General; and Sara Keith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions for two counts of rape of a child, two counts of attempted rape of a child, one count of aggravated sexual battery, and one count of incest, as follows:

> In April of 2011, [the petitioner] was charged in an eight-count presentment by the Knox County Grand Jury with five counts of rape of a child, one count of attempted rape of a child, one count of aggravated sexual battery, and one count of incest for events occurring between February 1,

2007, and October 19, 2010. The charges were based on allegations made by [the petitioner's] daughter, the victim.[1] Specifically, the presentment alleged rape of a child in Count One by virtue of penile/vaginal penetration; rape of a child in Count Two by penile/oral penetration; rape of a child in Count Three by digital/vaginal penetration; rape of a child in Count Four by object/vaginal penetration; attempted rape of a child in Count Five by attempted penile/anal penetration; rape of a child in Count Six by causing the victim's step-brother to engage in penile/vaginal penetration; aggravated sexual battery in Count Six by oral/breast contact; and incest in Count Seven by penile/vaginal penetration of his daughter.

At the time the abuse started, the victim was approximately four years of age. She lived in a trailer with [the petitioner], her mother, her older step-brother, and her two younger siblings. The victim and the step-brother slept on the couch at the time because the window in the victim's bedroom was broken.

The victim reported the abuse to her mother when she was approximately eight years of age and in the third grade. She did not remember exactly when the abuse started but stated that it happened almost every day for a long period of time. Her mother, in turn, reported the abuse to the Department of Children's Services. The victim was taken to the hospital where an exam was performed. Detective Brian Williams of the Knox County Sheriff's Office was assigned to the case. He interviewed [the petitioner], the victim, the step-brother, and the mother. After a search of the home, several items were seized: (1) two pairs of girl's panties; (2) men's underwear; (3) bed sheets; (4) a pillow sham; (5) a blanket; (6) a comforter; (7) five bath towels; and (8) a piece of plastic sheeting. Buccal swabs were taken of all four people interviewed.

Jennifer Milsaps, a Special Agent forensic scientist in the serology and DNA unit of the Tennessee Bureau of Investigation Crime Lab in Knoxville, testified at trial. According to Special Agent Milsaps, the results of testing the pair of green panties seized from the house indicated the presence of the DNA of the victim and [the petitioner] in the crotch area. The mother and step-brother were excluded as possible contributors. No other items were submitted for testing. Special Agent Milsaps agreed that DNA could be transferred from other clothing or from a towel to the panties. The

---

[1] It is the policy of this Court to protect the identity of the victims of sexual abuse.

vaginal swabs taken from the victim on the night she made the allegations were negative for the presence of sperm.

The victim was twelve years old at the time of trial. According to the victim, [the petitioner] started the abuse by "touching" her "breasts and private parts" with his hands and mouth. [The petitioner] also touched her vagina, using "his penis," "his fingers," and "his mouth." The victim testified that it went on "for like, a long time" and that her step-brother was often home at the time of the abuse. The victim described being raped "almost every day." She vividly described [the petitioner's] ejaculations as "clear-ish, but yet like a - - clear-ish, white-ish, but yellow-ish stuff" that [the petitioner] referred to as "baby juice." [The petitioner] also put "just his finger" inside her vagina, and she recalled him "sucking" on her breasts. [The petitioner] also licked her vagina. On one particular occasion, [the petitioner] sat on the victim while she was lying on her stomach and attempted to put his penis in her "butt." [The petitioner] was unsuccessful because the victim was "moving." The abuse happened in [the petitioner's] bedroom.

The victim also described an occasion on which [the petitioner] "tried to make [her step-brother] do it with [her]." The victim's step-brother corroborated this particular episode, explaining that he was around twelve years old at the time and both he and the victim were naked in [the petitioner's] bedroom. [The petitioner] was "giving instructions." For example, [the petitioner] told them to take off their clothes and instructed the victim to give her step-brother oral sex. The step-brother was unable to "get [it] up" and eventually "freaked out" and left. [The petitioner] implied that he would have sex with the victim after the step-brother left the room.

On cross-examination, the victim admitted that she had experienced a wide variety of mental and personality problems since early childhood, including visual and auditory hallucinations. The victim also reported that she had been under the care of ten different therapists since being separated from her family and that she had lived in a total of nine different facilities, group homes, and/or foster homes in the four years since she reported the abuse. The victim admitted various behavioral difficulties while in group care, including kicking a pregnant foster mother and slamming someone's hand in a door out of anger. The victim also admitted that she previously told case workers with the Department of Children's Services that [the petitioner] only touched her breast one time with his hand.

The step-brother testified that he recalled hearing "noises" often coming from [the petitioner's] bedroom. These noises happened when his mother was not present at the home. Some of the noises sounded like "moaning." He did not actually see anything happen between [the petitioner] and the victim.

The step-brother admitted that he and the victim engaged in sexual "penetration" on more than one occasion, starting around the time the victim was five years old and he was eight. The step-brother learned about sexual things from [the petitioner] and "this kid named T[]." He explained that [the petitioner] taught him about sex, even making him a "penis growing pump" out of a tube when he was eight or nine years of age. The first time anything happened between the step-brother and the victim, the two were "literally rubbing on each other." The step-brother also admitted that he and "T[]" had sex with the victim and that he had convinced the victim to have sex with other people.

At the conclusion of the State's proof, [the petitioner] moved for a judgment of acquittal on Counts Two (alleging penile/oral penetration), Four (alleging object/vaginal penetration), and Six (alleging penile/vaginal penetration of victim by the step-brother at the direction of [the petitioner]). The State conceded as to Counts Two and Four. The trial court agreed with the concession and amended Count Six to attempted rape of a child based on the proof presented at trial. [The petitioner] elected not to testify and did not present additional proof.

The jury found [the petitioner] guilty of rape of a child in Counts One (alleging penile/vaginal penetration) and Three (alleging digital/vaginal penetration). Additionally, [the petitioner] was found guilty of two counts of attempted rape of a child in Count Five (alleging attempted penile/anal penetration) and Count Six (alleging attempted penile/vaginal penetration of victim by the step-brother at the direction of [the petitioner]) as well as one count of aggravated sexual battery in Count Seven (alleging oral/breast contact) and one count of incest in Count Eight. The trial court sentenced [the petitioner] to twenty-five years for each conviction for rape of a child, ten years for each conviction for attempted rape of a child, ten years for the conviction for aggravated sexual battery, and five years for the conviction for incest. The trial court ordered partial consecutive sentences, imposing a total effective sentence of thirty-five years.

*State v. Stevie Michael Irwin, Jr.*, No. E2015-01448-CCA-R3-CD, 2016 WL 2853875, at *1-3 (Tenn. Crim. App. May 11, 2016), *no perm. app. filed.*

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition for post-conviction relief, arguing trial counsel was ineffective in advising the petitioner not to testify. An evidentiary hearing was held on October 16, 2020, during which the petitioner and trial counsel testified.

Trial counsel testified that he was appointed to represent the petitioner in 2012, approximately two years prior to trial. Trial counsel met with the petitioner multiple times and reviewed all discovery, including the serology report and statements from the victim and her step-brother. Because the victim had a history of auditory and visual hallucinations, the defense strategy was to introduce evidence of her hospitalizations and treatment in an effort to discredit her.

Trial counsel and the petitioner discussed at length whether the petitioner should testify at trial. Although the petitioner did not have a prior criminal history, he had issues with communication, and trial counsel was concerned that his testimony would be "more detrimental because [his testimony] was not always clear." Specifically, trial counsel noted the petitioner was "very slow to process [and regurgitate] information," and "there would oftentimes be long pauses on questions" when trial counsel expected a quick response. At trial, after the State rested, trial counsel had an additional conversation with the petitioner about the possibility of testifying, and trial counsel informed the petitioner that, while it was ultimately the petitioner's decision, trial counsel believed "there was great danger in [the petitioner] testifying."

The petitioner testified that trial counsel was the second attorney appointed to represent him on these charges. The petitioner and trial counsel had a cordial relationship, and trial counsel was "probably one of the most understanding people that [the petitioner] worked with in all of this." Although the petitioner wanted to testify and deny the allegations, trial counsel was worried the petitioner's communication issues would be exploited by the State to discredit him. The petitioner, who has offset Asperger's, admitted he has "a little bit of trouble when it comes to direct confrontational communication." Trial counsel practiced "mock trial situation[s]" with the petitioner to prepare him for the possibility of testifying. However, because the petitioner tended to become angry when he could not express himself clearly, "[the mock cross-examinations] would always end in [trial counsel] telling [the petitioner] that [he] couldn't . . . argue with the attorneys."

During trial, after the State rested, trial counsel told the petitioner that the State "did not have their stuff together" and that the petitioner should waive his right to testify. The

petitioner was reluctant to do this because, during voir dire, one of the jurors had stated that if a person is innocent they should testify on their own behalf. Ultimately, the petitioner felt he should follow trial counsel's advice and waived his right to testify during a *Momon*[2] hearing.

Had he testified at trial, the petitioner would have told the jury that his wife manipulated the victim and her step-brother into making the accusations against him. Regarding the DNA on the victim's underwear, the petitioner would have testified that he and his wife had sexual intercourse sometime before the police were called, and when his wife went into the bathroom to clean up, she must have accidentally picked up the victim's underwear instead of a towel.

After its review of the evidence presented, the post-conviction court entered a written order containing findings of fact and denying relief, and this timely appeal followed.

## *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for advising the petitioner not to testify. Specifically, the petitioner contends that he was "fully able to express his denials of the accusations against him, when testifying at the post-conviction hearing" and that his testimony at trial would not have undermined the strategy of challenging the victim's credibility. The State contends the post-conviction court properly denied the petition.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

---

[2] *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

At the evidentiary hearing, trial counsel testified he and the petitioner discussed the petitioner's potential testimony at length. However, because the petitioner has issues with communication, trial counsel believed there was "great danger in [the petitioner] testifying." Although trial counsel told the petitioner that he did not believe the petitioner should testify, the petitioner was aware he would need to make the final decision. The petitioner corroborated much of trial counsel's testimony, stating that he and trial counsel

discussed the possibility of the petitioner testifying and that trial counsel was worried about the petitioner's communication issues.

Implicit in the post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Trial counsel and the petitioner discussed the petitioner's right to testify, and trial counsel advised the petitioner that, because of the petitioner's issues with communication, his testimony would likely be "detrimental." Based on our review of the record, trial counsel's advice to the petitioner not to testify was an informed and sound tactical decision based on adequate preparation. Trial counsel's performance was "within the range of competence demanded of attorneys in criminal cases," *see Henley*, 960 S.W.2d 572, 579 (Tenn. 1997), and did not "fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 263, 369 (Tenn. 1996). The petitioner is, therefore, not entitled to relief.

Furthermore, during the trial, the trial court held a *Momon* hearing in which the petitioner testified he understood that he had a right to testify and that the decision of whether to testify was his to make. Trial counsel asked the petitioner whether they had "talked about potential advantages and disadvantages associated with [testifying]," and the petitioner answered, "That is correct." It is well-settled that a petitioner's "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Accordingly, the petitioner has failed to show that he is entitled to post-conviction relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE

- 8 -